# DANCY *v.* CLARK.

APPEAL BONDS; MANDAMUS; RECORDER OF DEEDS; CERTIFICATES OF IN-
CORPORATION; CORPORATE TRUSTEES.

1. No bond for costs is necessary where a supersedeas bond has been
given.

2. While it may be convenient and proper to entitle a petition for man-
damus in the name of the United States on the relation of the pe-
titioner, it is not ground for a dismissal of the petition that it has
not been so entitled. If necessary such a formality may be supplied
by amendment.

3. While the recorder of deeds for this District is a ministerial officer
without jurisdiction to pass upon the validity of an instrument of
writing presented to him for record, he is not wholly without dis-
cretion to determine whether a given instrument shall be admitted
to record. He has the right to exercise discretion in the premises,
but not judicial discretion; and whether his action in a given case
falls within the scope of authority vested in him is to be determined
by the court according to the principles of law applicable to the
facts.

4. While the writ of mandamus may now be regarded as a writ of right,
there is a sound discretion in the court, even though the relator
may technically be entitled to it, to refuse to grant it when its
issuance would not promote the substantial ends of justice, or when
it would prove unavailing or without beneficial results to the relator.

5. Even though a paper presented to the recorder of deeds for record ap-
pears on its face to be one entitled to be recorded, and the recorder
of deeds has exceeded his authority in refusing to record it, the court
will not, by mandamus, compel him to record it, if it appears upon
a consideration of the contents of the paper that it is invalid under
the law.

6. Under subchap. 4, D. C. Code, providing for the organization of corpo-
rations in this District, a company cannot be incorporated to do all
the classes of business for which corporations may be formed under
that subchapter, but can be incorporated only to engage in one such
business or enterprise.

7. The provision of sec. 633, D. C. Code, providing that a company in-
corporated for one class of business may, upon compliance with
certain conditions, extend its business to any other business au-

thorized by the general incorporation law, means the extension of business by the taking in of something cognate to the business to engage in which the company was originally incorporated.

8. A certificate of incorporation under the general incorporation law of this District, of a company, one object of which is stated to be "to perform contracts for maintaining and operating railways" is in antagonism to that provision of the law which excludes the operation of railroads from the category of classes of business for which incorporation may be granted, although the certificate also says, "except that the company shall not operate any railroad, engage in the business of a railroad, or do anything in the premises prohibited to incorporations of this character." There is no distinction between a "railroad" and a "railway;" and the previous clause of the certificate, and the exception, are inconsistent with each other; and such a certificate is not entitled to be recorded.

9. While, after a certificate of incorporation has been filed and the company has gone into operation, the inclusion in the certificate of powers not permitted may be regarded as surplusage, the inclusion of such powers in a certificate not yet filed will be held to be sufficient to justify the recording officer in refusing to accept it for record.

10. Under sec. 608, D. C. Code, part of the general incorporation law of this District, all of the trustees of a proposed corporation must be stockholders as well for the first year as for subsequent years; and the incorporators must be regarded as stockholders of the company in the first instance, and as the only stockholders, and the trustees are to be selected from their number; and a certificate contravenes the law which names five trustees to manage the affairs of the corporation, two of whom fail to sign the certificate of incorporation, and are apparently strangers to the proposed organization.

Nos. 1447 and 1458.　　Submitted December 7, 1904.　　Decided January 4, 1905.

HEARING on an appeal by the respondent, the Recorder of Deeds for the District of Columbia, from an order of the Supreme Court of the District of Columbia, directing the issuance of a writ of mandamus to compel him to receive and record a certificate of incorporation.　　　　　　　　*Reversed.*

The COURT in the opinion stated the case as follows:

The appellees, Horace F. Clark, William C. Prentiss, and

Albanus S. T. Johnson, in their own name, and without seeking to use the name of the United States for the purpose, filed their petition in the supreme court of the District of Columbia for the writ of mandamus to be directed to the appellant as the recorder of deeds for the District to require him to receive and record a certificate of incorporation which he had refused to receive and record on the ground that it did not comply with the requirements of the Code of law for the District. The certificate which was sought to be recorded is in the following words:

Certificate of Incorporation of the American Geological and Engineering Company.

We, the undersigned, citizens of the United States and residents of the District of Columbia, for the purpose of forming a corporation under the provisions of subchapter 4 of chapter 18 of the act of Congress entitled "An Act to Establish a Code of Law for the District of Columbia," approved March 3, 1901, and acts amendatory thereof, do hereby certify as follows:

First. The corporate name of the company is and shall be "American Geological and Engineering Company," and the object for which it is formed is —

To conduct the business of geological, mining, metallurgical, electrical, mechanical, civil, hydraulic, water supply, steam, pneumatic, gas, and chemical engineers and experts, and engineering in all its departments, phases, and branches, and as included in and incidental thereto, but not in limitation thereof.

To engage in and make, enter into, perform, and carry out contracts for constructing, creating, equipping, altering, repairing, maintaining, and operating all kinds of power plants and power transmission lines, telegraph and telephone lines and systems, water, gas, electric, and irrigation works and systems, mills, smelters, ore-reduction plants, buildings, canals, ditches, viaducts, aqueducts, dams, reservoirs, pipe lines, railways, tramways, tunnels, bridges, wharves, piers, machinery, and construction work, for any and all purposes, and any like work of internal improvement, public or private use or utility, except that

the company shall not operate any railroad, engage in the business of a railroad, or do anything in the premises prohibited to corporations of this character.

To engage in the manufacture of all kinds of mills, plants, engines, machinery, tools, brass, and metal work, boilers, power generators or converters, and like articles, and buying, selling, manufacturing, repairing, converting, altering, letting, hiring, and dealing in all kinds of machinery, implements, rolling stock, and hardware.

To purchase or otherwise acquire patents, patent rights, and privileges, improvements, or secret processes for or in any way relating to all or any of the branches of the business of the company aforesaid, and to grant licenses for the use of, or to sell or otherwise deal with, any such patents, patent rights, and privileges, improvements, or secret processes.

To engage in mining, quarrying, or otherwise removing or extracting, milling, concentrating, reducing, converting, smelting, treating, preparing for market, manufacturing, buying, selling, exchanging, and otherwise producing and dealing in gold, silver, copper, lead, zinc, brass, iron, steel, and all kinds of ores, metals, minerals, coal, hydro-carbons, oils, earth, stone, rock, clay, and other natural substances, and the products and by-products thereof, of every kind and description, and by whatever process the same can be, or may be, hereafter produced.

To engage in and make, enter into, perform, and carry out contracts for opening, developing, equipping, and operating mines, quarries, and wells of all kinds, and for all purposes, and buying, selling, cutting, sawing, transporting, and marketing timber; and

As agent or broker to buy, sell, lease, and deal generally in all kinds of lands, timber, quarries, wells, tunnels, mines, minerals, mining rights and claims, reservoir, mill, manufacturing and power plant sites, water rights, power plants, and transmission lines, mills, canals, ditches, water, gas, electric, and irrigation works and systems, dams, reservoirs, pipe lines, railways, tramways, tunnels, viaducts, aqueducts, wharves, piers,

and all like works of internal improvement, public or private use, or utility, stocks of mining and industrial companies of all kinds, and patent rights and privileges, improvements, or secret processes, for or in any way relating to all or any of the branches of the company aforesaid.

Second. The term of existence of the company shall be perpetual.

Third. The amount of the capital stock of the company shall be one hundred thousand dollars ($100,000), and the number of shares of which said stock shall consist shall be ten thousand (10,000) of the par value of ten dollars ($10) each.

Fourth. The number of trustees who shall manage the concerns of the company for the first year is five (5), and their names and residences are: Robert Forrester, Salt Lake City, Utah; Edward B. Jones, Salt Lake City, Utah; Horace F. Clark, Washington City, D. C.; William C. Prentiss, Washington, D. C., and Albanus S. T. Johnson, Washington, D. C., the last mentioned three being citizens of the District of Columbia.

Fifth. The name of the place in the District of Columbia where the operations of the company are to be carried on is the city of Washington, but the operations of the company may also be carried on at any other place in or outside of the said District of Columbia.

In testimony whereof we have hereunto set our hands and seals on the fifteenth day of April, A. D. 1904.

(Signed)     HORACE F. CLARK.        [SEAL.]
(Signed)     WILLIAM C. PRENTISS.    [SEAL.]
(Signed)     ALBANUS S. T. JOHNSON.  [SEAL.]

The certificate was duly acknowledged by the three persons last named, but was neither signed nor acknowledged by the other two of the five persons named as trustees for the first year.

Upon the filing of the petition a rule was issued upon the respondent Dancy, as recorder of deeds, to show cause, if any he had, why the writ of mandamus should not issue against him, as prayed in the petition. He filed an answer to the peti-

tion and the rule, in which he set forth that the certificate contemplated the carrying on by the proposed corporation of five several classes of business, instead of one separate and independent enterprise or business, in alleged violation of the provisions of the Code; that the certificate was not executed by all the proposed trustees; that the certificate contemplated the use of the funds of the company in the purchase of the stock of other companies in contravention of the law; and that for these reasons he had refused to receive and record the document. He also averred that his duty as recorder involved the exercise of discretion; that in the exercise of such discretion he had examined the certificate when it was presented to him, and he decided that it was not entitled to record in his office; and that such exercise of discretion by him was not subject to review in a court of law, and his action was not subject to be controlled by the writ of mandamus. He also claimed that the petition should be dismissed because it had not been filed in the name of the United States.

To this answer or return to the rule to show cause there was a demurrer interposed by the petitioners, which was sustained by the court, and thereupon the writ of mandamus was ordered to be issued. From this order the respondent, by direction of the attorney general, as stated in the record, noted an appeal to this court. No bond either of supersedeas or for costs was filed.

Subsequently, upon the refusal of the clerk of the court to issue the writ of mandamus pursuant to the judgment or order directing it, upon the ground that the appeal stayed the execution of such judgment, and that, under § 1001 of the Revised Statutes of the United States, no bond was required, the court, upon the application of the petitioners, ordered the issue of the writ. From this order, also, the respondent appealed, but three days afterwards filed an appeal bond. Subsequently, by direction of the department of justice, as stated in the record, the respondent filed a more formal appeal from the last-mentioned order to this court.

The cause is before us now on all these appeals.

*Mr. Morgan H. Beach,* United States Attorney for the District of Columbia, and *Mr. Jesse C. Adkins,* Assistant, for the appellant.

*Mr. William C. Prentiss* and *Mr. George Francis Williams,* for the appellees:

Section 605, D. C. Code, provides that "any enterprise or business which may be lawfully conducted by an individual" gives corporations the same status as individuals with respect to the scope of their activity. Legality of the activity is made the test, and not uncertain, indefinite, and, in these days, impossible, lines of demarkation between classes of industries. The scope of a man's business is a matter entirely within his own control, and it is to be observed that the language is, *"any* enterprise or business," and not *"any kind* of manufacturing, * * * *or* marketing business," as in the old law. D. C. Rev. Stat. § 553. "Any" is an indefinite term signifying one or more of many, when the context or other considerations warrant. See 2 Enc. 2d ed. 414, 419; 2 Cyc. 472, 473. Section 2 of the Code, however, furnishes a rule of interpretation which removes any doubt as to the intention of Congress. That section provides: "Words importing the singular number shall be held to include the plural, and *vice versa,* except where such construction would be unreasonable." That authorizing a corporation to engage in separate and distinct classes of business is not unreasonable, but consonant with modern policy, is demonstrated by reference to the corporation laws of the several states.

The Business Corporation Law of New York, chap. 567, Laws 1890, § 2: "Any lawful business purpose, or *purposes."*

The Corporation Law of New Jersey, chap. 185, Laws 1896, § 6, as amended by P. L. 1899, chap. 176, p. 473: "Any lawful purpose or *purposes."*

The Corporation Law of Delaware, chap. 273, Laws 1899 (vol. 21, Del. Laws), § 1: "Any lawful business or to promote or conduct any legitimate object or purpose." This is

held to authorize a corporation to unite any number or classes
of business.   See Address by Josiah Marvel (president of Del-
aware Charter, Guarantee & Trust Co.) before students of
University of Pennsylvania, May 14, 1902, p. 11; also Where
and How,—A Hand-Book on Incorporation, by John S. Par-
ker, p. 59.

The Corporation Law of West Virginia, chap. 54 of the
Code: "1. For manufacturing, mining, or insuring    *   *   *
10. And for any other purpose or business useful to the public
for which a firm or copartnership may be lawfully formed in
this State."   Held that a corporation is not limited to one
object or purpose.   See Where and How, supra, p. 72.

The Business Corporation Law of Massachusetts, §§ 1, 7,
and 8.   Section 8 authorizes corporations to carry on as many
different kinds of business as are set forth in the agreement of
association.

The Corporation Law of Maine, chap. 48, Rev. Stat. 1883,
§ 16: "Any lawful business including corporations for manu-
facturing, mechanical, mining, or quarrying business," etc.
Held, that a corporation is not limited to one object or purpose.
See Where and How, supra, p. 47.

Minnesota Gen. Stat. 1878, chap. 34, title 2.   See State v.
Minnesota Thresher Mfg. Co. 40 Minn. 213.

That the broad language of sec. 605 contemplates the inclusion
of more than one class of business is further confirmed by the
language of § 607, "its operations named in such certificate;"
sec. 612, "for carrying on all kinds of business within the
objects and purposes of said company; and sec. 633, "for the
purposes of the corporation;" and that any corporation by
amendment "may extend its business to any other business
authorized hereby."   See also sec. 635.

We submit that sec. 633 is of itself conclusive of the ques-
tion, for if a corporation, by amendment, can extend its object
to any business other than that named in its certificate, it neces-
sarily follows that there is no prohibition against a corporation
engaging in more than one class of business, and it is absurd

to suggest that the Code can be construed to prohibit the doing of a thing in the original certificate which it authorizes to be done immediately thereafter by amendment, and it is equally absurd to suggest that sec. 633 must be construed to limit the right of extension to *one* additional class of business and thus force a construction upon sec. 605 authorizing a company to include two kinds of business in its certificate, but not three or more. The principle governing here is established in *People* v. *Beach,* 57 How. Pr. 337, 19 Hun, 259, and it is only necessary to suggest that there the New York statute was limited by the words "any kind of mining, etc., business," in the disjunctive, and the later clause provided that a corporation might, by amendment, extend its business to *any* other mining, etc., business, in the disjunctive, which the court construed in the light of the limitation "any kind," in the preceding section, to authorize extension to any other kind of the same class of business mentioned in the certificate. Here there is no such limitation in the main provision and the later provision is equally broad. But the principle of *People* v. *Beach* is conclusive. The court said (57 How. Pr.) : "If it was the policy of the statute * * * to limit the formation of a company to one branch or kind of mining it was certainly a direct and flat contradiction thereof to expressly declare in a subsequent section that, when organized, it might extend its business to any other * * * mining * * * business."

"Any other business" cannot be read "another kind of the same class of business" without indulging in legislation. See *State* v. *Corkins,* 123 Mo. 56; *Brown* v. *Corbin,* 40 Minn. 508.

The comment of the court in *People* v. *Beach,* upon the suggestion that to allow corporations to engage in more than one kind of mining would afford greater opportunity for the perpetration of fraud upon the public, is also pertinent here. The court says: "It may be answered that an association avowedly formed to mine for three metals affords no greater opportunity for imposition upon the public than one formed to mine for one."

Mr. Justice Morris delivered the opinion of the Court:

Motion was made in this court by the appellees to dismiss the last-mentioned appeal on the ground that the order had already been superseded by the bond given, and there had been no bond for costs filed. This motion was held over to the hearing on the merits. It does not seem to demand serious consideration by us. If the order of the court below had already been appealed from and a supersedeas bond given, this second appeal from the same order was, at the utmost, merely superfluous, and it does no harm to anyone. Nor was any bond for costs required. That was necessarily involved in the supersedeas bond. The two appeals from the last order of the court below will be regarded as one appeal.

We have now, therefore, two appeals in the same case. Under the second of these appeals the only question which is sought to be raised, is whether the original appeal from the original order of the court, taken by direction of the attorney general, without bond, operated as a supersedeas of that order. But this question is now no more in this case than a moot question, since an appeal bond was afterwards actually given within the time limited by the rule of this court for the perfection of such appeal if such a bond was necessary. It does not seem to us, therefore, that we are here called upon to determine that question, inasmuch as it has been eliminated from the case.

2. In the next place it is contended on the part of the appellant that the petition of the appellees should have been dismissed, for the reason that it was not filed in the name of the United States. And in support of this proposition the authority of various text writers and the long-continued practice in this District are appealed to; and it is urged there is nothing in the new Code (chap. 42, §§ 1273–1282) to the contrary. But this contention, we think, implies some misapprehension of the nature of the proceedings connected with the writ of mandamus.

It seems to be quite true that the practice here has always been to entitle proceedings in what may be designated as the action of mandamus, in the name of the United States on the relation of the person petitioning for the writ; and such, indeed,

seems to have been the general practice everywhere else. But, if the secs. 1273 to 1282 of the Code, which are intended to regulate, as far as they go, the proceedings in the action of mandamus, do not, by implication, abolish this formality, which it is not necessary here to determine, yet, inasmuch as the writ of mandamus is no longer the prerogative writ which it once was, for which application had to be made to the sovereign in person, or to his attorney general as his representative, or to the court which inherited the personal jurisdiction of the sovereign, and which, in England, was the court of King's bench, and is, in our modern practice, no more than an action at law between parties (*Kentucky* v. *Dennison,* 24 How. 66, 16 L. ed. 717; *Kendall* v. *Stokes,* 3 How. 100, 11 L. ed. 512; *Kendall* v. *United States,* 12 Pet. 615, 9 L. ed. 1217), the use of the name of the State or of the United States has become no more than a mere formality, which should not be permitted to affect the substance of the action. It is a formality which, if it be necessary for the regularity of proceedings, and has been omitted, whether designedly or by inadvertence, may well be supplied by amendment, either in the court below or in this court. After all, in the proceedings thus far had, the name of the United States would only enter into the caption of the case, and the caption, in the present consideration, is no part of the proceedings.

The petition is not the petition of the United States, but that of the relator. Indeed, the petition is addressed to the United States for permission to use their name in the further proceedings contemplated. Or, in modern practice, it is addressed to that branch of the sovereignty of the United States, the court, in which that special jurisdiction has become vested. When the matter is examined carefully, it would seem to be absurd to say that the petition should be entitled as the petition of the United States on the relation of the person who asks the intervention of the sovereignty. It is only when the alternative writ of mandamus is issued, as was the ancient practice, or when the rule to show cause is granted, as is the modern practice, that the sovereignty can be presumed to have intervened,

VOL. XXIV—32

and to be regarded thereafter as the actor, at least as the nominal actor, in the case.    This is entirely consonant with what the text writers say on the subject.    Thus, one of the later writers, Moses on Mandamus, p. 194, says:

"In the United States it [the writ] has always been issued in the name of the sovereignty by which it has been authorized. The suit, therefore, is properly prosecuted in the name of the State, on the relation of some person or persons who is called a relator."

But it does not follow that, because the writ is prosecuted in the name of the State, therefore the petition also should be filed in the name of the State.    The petition is peculiarly the petition of the individual, as we have stated, and not that of the State; and while it may be, and undoubtedly is, convenient and proper to entitle it in the name of the State on the relation of the petitioner, it is no ground for dismissal that it has not been so entitled.    The Code would seem to contemplate the omission of the formality; but whether such is the effect of the provisions to which reference heretofore has been had, it is unnecessary here to determine.    The assignment of error based upon this ground we cannot regard as well founded.

3.  The appellant's other assignments of error are based upon the theory that the certificate of incorporation here in question does not conform to the requirements of the law, inasmuch as it is proposed by it to organize a corporation to carry on five distinct and independent branches of business or enterprises, when the Code, as it is claimed by the appellant, restricts the organization to one enterprise or business; and because, also, the certificate proposes that the corporation to be formed may purchase stock in other corporations, contrary to the express prohibition of the Code; and because in general the certificate fails to comply with the provisions of the Code in regard to the matter of incorporation.    On the other hand, it is contended by the appellees that this theory finds no support in the Code; and that in any event the recorder of deeds is a purely ministerial officer whose duty it is to receive papers for record, and

not to pass upon their validity.    We will first consider this last
claim of the appellees.

Undoubtedly the recorder of deeds is in the category of min-
isterial officers, and has no jurisdiction to pass upon the validity
of instruments of writing presented to him for record.    It re-
quires no elaboration of law or of the authorities to sustain this
contention.    But he is not for this reason wholly without discre-
tion to determine whether any instrument of writing should be
admitted to record.    He is by the law required to receive and
file, or receive and record, as the case may be, such instruments
as have been duly executed, and which purport on their face to
be of the nature of the instruments entitled to be filed or
recorded.    Assuredly, supposing some extreme cases, in order
to illustrate what we desire to say, if a promissory note, or a
deed of conveyance of land, or a chattel mortgage, were offered
to him to be filed as a certificate of incorporation, he would
certainly be warranted in a refusal to receive it.    Nor would
he be warranted in receiving and filing or recording an instru-
ment of writing purporting to have been acknowledged before
some person not entitled to take acknowledgments.    Much less
would he be warranted in receiving for record a paper that was
not acknowledged at all.    He has the right to exercise discre-
tion in the premises, but not judicial discretion.    The courts
will sustain him when he acts within the limits of the discretion
reposed in him; they will coerce his action when he has ex-
ceeded those limits and denied a right to which parties are by
law entitled.    Whether his action in the present case falls
within or without the scope of the authority vested in him
remains to be determined according to well-established prin-
ciples of law.

But in the consideration of this matter it must be remem-
bered that, while the writ of mandamus may now be regarded as
having become a writ of right, there is yet a sound judicial
discretion reposed in the courts, even though the petitioner for
it may be technically entitled to it, to refuse to grant it when
its issuance would not promote the substantial ends of justice,
or when it would prove unavailing; or when it would be without

beneficial results to the relator or petitioner. See 19 Am. & Eng. Enc. Law, 2d ed. p. 753, title, *Mandamus,* chap. 3, § 5, and 13 Enc. Pl. & Pr. p. 493, title, *Mandamus,* chap. 3, § 5, where the authorities on the subject are collated. See also *State ex rel. Steubenville Gas & E. Co.* v. *Taylor,* 55 Ohio St. 61, 44 N. E. 513, and *Miller* v. *Tod,* 95 Tex. 404, 67 S. W. 483. Consequently, even if a paper on its face appears to have been regularly executed so as to entitle it to record, and the recorder had exceeded his authority in refusing to receive and record it, yet the court will not, by the writ of mandamus, coerce his action, if it appears upon consideration of the contents of the paper that it is invalid under the law, for, in that event, to coerce his action and to command the receipt and record of the paper would be a nugatory thing in law.

4. This brings us to a consideration of the substance of the certificate of incorporation here in controversy.

This certificate is quite remarkable for its verbosity and repetitions. It would seem that no term or expression within the remotest degree connected with the science of civil engineering had been omitted, and that there was an effort in it to take in and cover all the vast area of the extensive realm of mining, manufacturing, mercantile, mechanical, and transportation industry, from the matter of taking any and every mineral, coal, iron, copper, and all the rest of them, out of the earth, to that of the purchase and sale of patents and patent rights and the operation of great railway systems. It may be doubted whether ever before there has been a more ambitious attempt to take in a wider range of human industry for one small corporation. But all this the appellees claim to be entitled to do under the general incorporation act comprised in chapter 18 of the Code of Law of the District of Columbia, and especially in subchapter 4, secs. 605 to 644 of that chapter, which they claim should be liberally construed for the purpose. On behalf of the appellant, it is contended that their attempt is unauthorized by the law, and that, both by the letter and the spirit of the enactment, they are restricted to one class of business, and are not permitted to take in five or more of them.

Chapter 18 of the Code provides for the formation of corporations by the filing of certificates in the office of the recorder of deeds for this District. It contains fourteen subchapters, of which the first thirteen provide for the organization of corporations of as many different kinds, and the last subchapter provides for the mode of their dissolution. It is very clear from the whole tenor of the enactment that these different kinds of corporations were intended to be kept separate and distinct from each other, and that no association should be incorporated under the act which combined, for example, the work of institutions of learning, provided for in subchapter 1, and that of benevolent and educational societies, provided for in subchapter 3. To show this conclusively it is not necessary to go beyond the very first words of each subchapter. Under subchapter 3, any three or more persons may effect an organization, while, under subchapter 1, the association of five or more persons is required. And thereafter different provisions are made for the different classes or kinds of corporations.

Subchapter 4 it is which provides for the organization of corporations for the principal industrial purposes, which are grouped under the title given to the subchapter, "Manufacturing, Agricultural, Mining, Mechanical, Insurance, Mercantile, Transportation, Market, and Savings Bank Corporations." This title is the same that occurs in the former general incorporation act contained in the Revised Statutes of the United States for the District of Columbia, as secs. 519 to 676, both inclusive, of those statutes, but the words are not, as in the Revised Statutes, carried into the text of the Code. This text is somewhat broader in its scope than were the corresponding sections of the Revised Statutes, and the evident purpose of the Code in this subchapter was to authorize incorporation for various purposes of an industrial character for which the Revised Statutes made no provision, or in regard to which at all events there was doubt. The Revised Statutes provided, in sec. 553, that any three or more persons who desired to form a company for the purpose of carrying on any kind of manufacturing, agricultural, mining, mechanical, insurance, mer-

cantile, transportation, market business, or savings bank in the
District, might file a certificate and become incorporated.    The
provision of the Code is that "any three or more persons who
desire to form a company for the purpose of carrying on any
enterprise or business which may be lawfully conducted by an
individual, excepting banks of circulation or discount, rail-
roads, and such other enterprise or business as may be otherwise
specially provided for in this Code, may make, sign, and ac-
knowledge before some officer competent to take the acknowledg-
ment of deeds, and file in the office of the recorder of deeds a
certificate in writing, provided that nothing herein contained
shall be held to authorize the organization of corporations to
buy, sell, or deal in real estate, except corporations to transact
the business ordinarily carried on by real-estate agents or
brokers," and thereby become incorporated.      § 605.

·It is apparent, therefore, that the Code authorizes incorpora-
tion by certificate for any lawful business, with certain specified
exceptions; but it does not follow that it authorizes or allows
the combination of all classes of industrial business by one cor-
poration.    On the contrary, the tenor of the enactment is
decidedly adverse to any such theory.   In sec. 606, for example,
which prescribes the five requisite statements to be contained
in any valid certificate, the first statement which is required to
be made is that of "the corporate name of the company and the
object for which it is formed."    This means that the class of
business to be engaged in must be specified.    It does not mean
that the proposed company may combine all the classes of busi-
ness for which corporations may be formed under the subchap-
ter.    For if persons proposing to form a corporation under this
subchapter were at liberty to combine two or more, or all the
classes of business included in the subchapter,— and if two
might be combined, all might be combined,—the requirement
of a specification of the object of the company would be mean-
ingless and absurd.    It would be sufficient in all cases to say
that the proposed company had for its object any and all enter-
prises and classes of business in which an individual might law-
fully engage, without further specification.    Nor would the

objection be overcome by the recital of all the classes of business by name.

Again, in sec. 633 it is provided that "any company which may be formed under this subchapter may increase or diminish its capital stock by complying with the provisions of this subchapter, to any amount which may be deemed sufficient and proper for the purposes of the corporation, and may also extend its business to any other business authorized hereby, subject to the provisions and liabilities of this subchapter." And in sec. 635 it is provided that "whenever any company shall desire to call a meeting of the stockholders for the purpose of increasing or diminishing the amount of its capital stock, or for extending or changing its business, it shall be the duty of the trustees or directors to publish a notice, etc., etc.," and subsequent sections provide that this may be done by a vote of two thirds of the stock in its favor, and the filing of a new certificate, executed by the chairman of the meeting and countersigned by the secretary, in which, with other details, there must be stated the new business to which the business of the company is extended or changed.

It is argued from this that, if a company may, under the statute, be organized for one class of business, and yet may immediately afterwards effect an extension or change of its operations to any other business authorized by the subchapter, it necessarily follows that it may, in the first instance, combine in its certificate any two or more of the different classes of business. But we think that the inference to be drawn from the statute is the very opposite of this. There would be no necessity for any provision for change or extension if the purpose of such change or extension could be effected in the first instance by the original certificate. All that need be done would be, somewhat in imitation of the ambitious certificate involved in the present case, to specify all the different classes of business which, in the course of time it might be desired to combine, or to specify one and add some such expression as "any other business that would be lawful under the statute." Under such a construction of the statute its provisions for extension

or change of business would very soon become obsolete. But plainly this was not the legislative intention. Plainly, when the statute provided that "any three or more persons who desire to form a company for the purpose of carrying on any enterprise or business which may be lawfully conducted by an individual," might form a corporation by certificate providing specifically for a precise statement of the specific object of the organization, it meant *one* business, *one* enterprise, and not a combination of all the enterprises and of all the classes of business provided for in the statute. It was not the intention that two such radically distinct and independent classes of business, as mining and keeping a market or a savings bank, should be combined in this District of Columbia; nor that the business of manufacturing should be combined with the business of insurance in the operations of one and the same corporation.

Provision is made for extension of business by a corporation; but, in the ordinary understanding, extension of business is the taking in of something cognate. A company organized for the making of cotton goods might well be extended to the manufacture of woolen goods, possibly even to the manufacture of iron or steel, for it is all manufacture. Provision is made for a change of business; but, even if we assume that this change might be made to a radically different class of business, as, for example, from that of mining to that of agriculture, yet the very word *change* implies the abandonment of the one by the adoption of the other, not the combination of both. Combination, it is true, is in the spirit of the age; but it is also true that it is within the province of the legislature to guard its limitations with jealous care; and we do not think that, in the provisions of the Code in regard to corporations, it was the purpose of Congress to throw wide the gates for the unrestricted aggregation of industry in one organization.

We think that the certificate of incorporation executed by the appellees and proposed by them to be filed, is objectionable, in as far as it combines with the business of civil engineering, which seems to be its main object, that of the operation of power plants, that of manufacturing machinery, that of mining, that

of purchasing patents and patent rights, that of transporting and marketing lumber, and perhaps other classes of business; for, in the multitudinous verbiage of the certificate, it is somewhat difficult to say how many classes of business are included in it.

5. We think, however, that, besides the principal one of civil engineering, there is one class of business specified in the certificate which requires special mention by us. Among numerous other things with which it is combined, it is stated that one object of the proposed corporation is "to perform contracts for maintaining and operating railways." We know not whether any distinction is sought to be made between the word "railways" and the word "railroads;" but we certainly cannot recognize any distinction in this connection. The avowed purpose of the corporation to operate railways or railroads is in direct and positive antagonism to the provisions of the Code in the premises, which in express terms excludes the operation of railroads from the category of classes of business for which incorporation can be granted under this statute. It is true that in the same clause of the certificate there are these words, "except that the company shall not operate any railroad, engage in the business of a railroad, or do anything in the premises prohibited to corporations of this character." But this exception or proviso does not remedy the objectionable feature of the previous part of the certificate. It leaves it to conjecture and possibly hereafter to judicial construction, whether, as already mentioned, a distinction is intended between the word "railroad" in the exception and in the statute and the word "railway" used in the previous part of the certificate; and what the distinction is, if any such is intended. As we recognize no distinction here, we must hold that the exception and the previous clause are inconsistent with each other, and either the whole is meaningless, or one must be disregarded. We do not care here to determine how to construe the provision; but we must hold that, under any aspect of the case, the court should not sanction a certificate which seeks first to do an illegal thing and then says there is no

intention to violate the law. On the ground of this clause alone, if for no other reason, the certificate should be rejected.

But it is contended on behalf of the appellees that the inclusion in a certificate of powers not permitted is to be regarded as surplusage. And in support of the contention are cited the cases of *Grangers' Life & Health Ins. Co.* v. *Kamper,* 73 Ala. 325; *Schick* v. *Citizens' Enterprise Co.* 15 Ind. App. 329, 57 Am. St. Rep. 230, 44 N. E. 48; *Eastern Pl. Road Co.* v. *Vaughan,* 14 N. Y. 546. These cases do not cover the question. They are applicable in cases where a certificate has been actually accepted and filed, and the company goes into operation, and afterwards a controversy arises between itself and its stockholders, or between it and other persons, wherein the extent and validity of its powers are called in question. In such cases the certificate is upheld so far as it is valid, and the illegal parts, if any, are disregarded. But these cases present very different conditions from that wherein, as in the present case, it is sought, through the instrumentality of the writ of mandamus, to place an illegal thing upon record, possibly to become a snare to the unwary. This, we think, the courts should not do when it is so easy to execute and file a proper certificate free from objectionable features.

6. There is yet another objection to the certificate now before us, and one which can easily be, and should be, removed. Five trustees are named to manage the affairs of the corporation for the first year. Only three of these have executed the certificate. So far as we are advised by the certificate itself, the other two are total strangers to the proposed organization, and may forever so remain. Now the Code requires that the trustees, who are to manage the affairs of such corporations, shall be stockholders; and none but stockholders can be trustees. Sec. 608 of the Code governs the matter. This is in the following words:

"The stock, property, and concerns of such company shall be managed by not less than three nor more than fifteen trustees, who shall respectively be stockholders, and a majority citizens of the District, and shall, except for the first year, be annually

elected by the stockholders, at such time and place as shall be determined by the by-laws of the company."

Plainly the requirement of this section is that the trustees shall at all times be stockholders, as well for the first year as for all subsequent years. The only difference is that for the first year they are to be nominated in the certificate, and for all subsequent years chosen by election. True it is that ordinarily no certificates of stock are issued until after the charter is granted and an organization effected; and in the ordinary sense there are no stockholders until the stock is issued. Consequently, as it is argued, it cannot have been the intention that the trustees for the first year of the organization must necessarily be stockholders. In support of the contention are cited secs. 608, 612, and 613 of the Code, with other sections which we do not deem relevant. Section 608, which we have already had occasion to cite, provides that "the stock, property, and concerns of such company shall be managed by not less than three, nor more than fifteen, trustees, who shall respectively be stockholders." Section 612 provides that "the trustees shall have power to make * * * by-laws * * * for the management and disposal of the stock and business affairs of such company." And sec. 613 provides that "no company incorporated under this subchapter shall be authorized to transact any business until 10 per centum of the capital stock shall have been actually paid in, either in money or in property at its actual value; and it shall be lawful for the trustees to call in and demand from the stockholders the residue of their subscriptions in money or property, etc., etc., etc." From all which it is sought to be inferred that the trustees for the first year must exist before there are or can be any stockholders, and that therefore they themselves need not be stockholders. But we are clearly of opinion that this is not the proper inference to be deduced from the sections cited, or from any other sections of the Code that have any bearing on the subject.

The argument would have force and weight if we were considering one of the special charters of incorporation which were heretofore the usual mode of incorporation by legislative au

thority, and wherein certain persons named as incorporators were in fact no more than commissioners to open books of subscription and to organize a company rather than to manage its affairs. The scope and purpose of general incorporation acts are somewhat different. Under these the persons who execute a certificate of incorporation become the corporators and stockholders, and it is not necessary that there should be any books of subscription opened. Our statute, § 607, declares that "when the certificate shall have been filed in accordance with the provisions of the preceding section, the persons who shall have signed and acknowledged the same, and their successors, shall be a body politic and corporate in fact and in name, by the name stated in such certificate, etc., etc., etc." Those persons, therefore, who execute the certificate, and those persons alone, become the owners of the company. They are not required to take in anyone else with them. They may themselves have contributed, or may intend to contribute, all the money required for the enterprise. They and their successors are the corporation, and they cannot have successors except by the transfer of their interest, in part or in whole, by their own act or by operation of law, to other persons. The interest which is in them originally is the stock of· the company, and it is not necessary that such stock or interest should be represented by a certificate of stock, or by any other writing, although it is usual so to represent it for evidence of the fact and for convenience of· transfer. It is the matter of the transfer of stock, or the mode in which it is to be called for and the call enforced, if the original incorporators elect to dispose of the whole or any part of their interest, over which the trustees are to have control and management, and for which control and management there is a special propriety that they themselves should be interested as stockholders. Of course, it may well be that persons who organize companies under a certificate of incorporation may at once interest other ·parties, and devest themselves of all interest in the enterprise or business, or of a partial interest therein; and it may be that they would prefer to open books of subscription to the stock and evidence the amount of the in-

terest which they desired to retain by a formal subscription to a certain number of shares of stock. But it is not to be controverted that the corporators may issue all the stock to themselves in such proportions as they may agree upon or deem proper. The only limitation upon their right so to do is that no business is to be transacted by the company until 10 per centum of its capital stock is actually paid in, either in money or in property at its actual value.

The incorporators, therefore, must be regarded as the stockholders of the company in the first instance, and as the only stockholders, and the trustees are to be selected from their number. It is not competent for anyone to be a trustee for the first year by designation in the certificate who is not one of the incorporators. While the trustees, as such, are not required to execute the certificate, yet they are virtually required to do so, because they must be designated from among the persons who do execute it. The present certificate contravenes the law in so far as it goes out of the incorporators for the selection of trustees.

From all that we have said it necessarily follows, in our opinion, that this certificate is fatally defective in many particulars, and that the writ of mandamus should not be used to give it apparent efficiency by its admission to the files of the recorder's office; and it also follows that the orders appealed from should be reversed.

The conclusion is that the orders appealed from will be reversed, with costs, and the cause will be remanded to the Supreme Court of the District of Columbia to vacate such orders, to discharge the rule to show cause, and to dismiss the petition. And it is so ordered.                              *Reversed.*