ADDISON–WESLEY PUBLISHING COMPANY, Inc., Francis Weston Sears and Mark W. Zemansky, Plaintiffs,

v.

Dale BROWN, Victoria Bagneres and V. Bherens, d/b/a University Science Publications and C. L. Brown, Defendants.

No. 62–C–356.

United States District Court
E. D. New York.

Aug. 12, 1963.

Cowan, Liebowitz & Latman, New York City, Alan Latman, Walter J. Derenberg and Marvin S. Cowan, New York City, of counsel, for plaintiffs.

Joseph J. Crisa, Long Island City, N. Y., Murray J. Halper, Long Island City, N. Y., and Maxwell Okun, New York City, of counsel, for defendants.

ROSLING, District Judge.

As to the first cause of action pleaded in the complaint, it is directed that defendants,[1] their agents and servants be enjoined during the pendency of this action and permanently from infringing the copyrights of plaintiff Addison-Wesley evidenced by Certificates of Registration Numbers A423800, A423781 and A175928 in any manner, and in particular, but without limiting the generality of this restraint, from printing, reprinting, publishing, vending or distributing any copies of the so-called Manual of Solutions, Exhibit 2 annexed to the complaint, or any matter in any form purporting to constitute solutions in respect of the textbooks hereby held infringed of any problems therein contained.

To the extent that the complaint may require amendment to serve as a basis for the relief granted, the Court holds that the issues hereby disposed of were tried by express or implied consent of the parties, and are, accordingly, treated in all respects as if they had been raised in the pleadings.[2]

The remaining issues arising upon the first cause of action and the further relief, if any, to be granted thereunder [3] and the issues tendered in the second to the sixth causes of action, involving generally claims of unfair competition and related matters, are set down for pretrial procedure in accordance with the provisions of Rule 16. The attorneys for the parties are directed to appear before this Court on October 21, 1963 at 10.00 A.M. for conference and relevant action.

Findings of fact upon the issue thus far disposed of are set out in what follows immediately.

1. The defendants named in the complaint are "Dale Brown, Victoria Bagneres and V. Bherens d/b/a University Science Publications and C. L. Brown." The parties have stipulated that only Dale Brown and Victoria Bagneres have been served in this action and that the answer interposed was filed on behalf of these two defendants only. Such answer in its 29th paragraph admits that University Science Publications, "a *sole proprietorship*" published the Manual now found to infringe. Evidence given upon the trial did not bear directly upon the composition of the business entity thus styled. The Court, accordingly, assumes that plaintiffs acquiesced in the qualified admission made by defendant in the paragraph just cited. The operative force of the Court's determination of the first cause of action is, insofar as the defendants themselves are subjected thereto, intended to be directed against Dale Brown, individually, and Victoria Bagneres, both individually and doing business as University Science Publications. The action, moreover, is continued as to said defendants in respect of all causes of action pleaded in the complaint, but severed as to the remaining defendants named in the caption, to wit; "V. Bherens" and "C. L. Brown." To the extent that they may fall within the description of agents and servants of the defendants Dale Brown and Victoria Bagneres, the injunctive directions run against them.

2. Rule* 15(b), made applicable to Title 17, Copyrights, by Rule 81(a) (1) and 17 U.S.C. § 101, Rules of Practice as Amended, No. 1.

   * Reference here and elsewhere, unless otherwise indicated, is to Rules of Civil Procedure.

3. See 17 U.S.C. § 101(b) (c) and (d).

The individual plaintiffs, Francis Weston Sears (Sears) and Mark W. Zemansky (Zemansky), have achieved eminence in the field of scientific education. Sears is a professor and chairman of the Department of Physics at Dartmouth College, Zemansky, a professor and past chairman of the Department of Physics at the City College of New York.

The corporate plaintiff, Addison-Wesley Publishing Company, Inc. (Addison), is a substantial, long established and favorably known, book publishing house specializing in textbooks on scientific and engineering subjects.

About 1949 Addison commissioned the professors to write a number of college physics textbooks among which were a companion pair entitled "College Physics" and "University Physics." The only significant difference between these works lay in the degree of mathematical sophistication presumed by the authors to be possessed by the users. Whereas the "College" text could be comprehended by students who had completed no prerequisites beyond trigonometry the "University" work assumed a familiarity with the principles of the calculus and hence utilized its procedures when appropriate.

Each of these texts was comprised of two major divisions and was published either as a single complete volume, or in its components as two separate books. It is as to Part II of the second edition of University Physics, complete, Registration No. A175928 and Part II of the third edition of College Physics, complete, Registration No. 423800 and, Part II alone, Registration No. 423781, that the charge of infringement is advanced by the plaintiff and upheld by the Court.[4]

The copyright ran to Addison to whom Sears and Zemansky had assigned their interest in the books, including the right to secure the statutory copyright. Such copyright was secured by Addison on January 21, 1955 as to "University Physics" and on January 4, 1960, as to "College Physics" by publication on or about such dates with sufficient notice of copyright.[5]

Plaintiffs' textbooks were each divided into 49 chapters of which chapters 24 through 49 comprised Part II. At the close of most of the chapters the authors had posed problems ranging in number from less than 10 to as many as 30 or more. In the University Physics book an appendix supplied supplementary problems segregated according to chapters illustrated thereby. The publisher's prefatory note explained that "These [supplementary] problems have been reproduced from the plates used in the first edition." All problems had been carefully and with the expenditure of much skill and effort edited, selected and arranged to serve as exercises illustrating, with an intended progressive increase in difficulty of solution, the didactics of the chapter to which they were appended. The problems corresponded to the sequence of the instructional content of the text. As part of their preliminary procedures the authors had themselves solved the problems their texts were to propound to the student users. These solutions, however, were not published by them in any form, although quantitative answers to odd-numbered problems were supplied in one of the several appendices printed in the texts. These might serve as a checklist for the student user of the book to be compared by him with the

---

4. A promise was made by defendants in a sales brochure to issue, when ready, similar solutions manuals directed to the problems in Part I of the textbooks upon their reprint projected for the Fall of 1962.

5. Defendants conceded upon trial that compliance with the requirements for copyright as to the complete textbook operates to secure copyright of the component parts though these are marketed separately, and to entitle the components to such protection against infringement as the whole would be entitled to receive. See 17 U.S.C. § 3: "Protection of component parts of work copyrighted; * * *." King Features Syndicate, Inc. v. Bouve, 48 U.S. Patent Quarterly 237 (D.C.D.C.1940). See, also, Bouve v. Twentieth Century-Fox Film Corp., 74 App.D.C. 271, 122 F.2d 51 (1941).

answers independently arrived at by his own calculations, giving him assurance that the steps in his solution which produced a matching answer were correctly carried through.

Those for whose use the books were intended and who would be the actual purchasers were the college undergraduates, largely freshmen, who were taking their initial courses in physics. The market, however, was manifestly a captive one, being controlled by the physics faculty of those colleges which by "adopting" a text for use in their instruction insured that the college bookstore would stock the text for sale to the students and that the students would buy.

Several hundred thousand copies of Sears and Zemansky physics textbooks had upon such adoption been sold through the years and the experience of the professors thus gained, as well as Addison's own marketing research in the sale of textbooks generally, persuaded the plaintiffs, as it does the Court, that availability to the students of a book of solutions to the exercises incorporated in the texts would adversely affect the prospect of their collegiate adoption.[6]

In this circumstantial context defendants undertook to supply the student purchasers of the textbooks with solutions which the authors and the publisher, mindful marketwise of the pedagogical attitudes of the instructors, had refrained from publishing so as to bar access thereto by students. With the prospect or, at least, hope of financial gain as motivation defendants published, copyrighted and proceeded to vend in 1961 a "Manual of Solutions" which on its frontispiece carried the following legend: "Physics Series: Solutions to the problems appearing in 'University Physics' and 'College Physics' by Sears and Zemansky—Part 2." Defendants evincing an initial prudence sought to obtain the consent of Addison before undertaking the issuance of the manual. Permission was refused, but this did not halt them. Circularizing the trade as to their project, they succeeded in placing their work in a number of college bookstores and others of general clientele, and in at least one instance by misrepresenting that the manual was being issued with the consent of the copyright owner and implying that it had the sponsorship of the authors of the textbooks persuaded a large and well known retailer of educational books to stock their manual.

The manual which runs to 133 pages discloses in its preface the nature of its content and the relationship of such matter to the texts that have been pilfered in its production. The prefatory statement captioned, "KEY TO NUMBERING" explains:

"This manual contains the solutions to the problems in 'College Physics' and 'University Physics', Part II, by Sears and Zemansky.

"The chapter numbers in this manual correspond to those in the texts. However, a special notation is used for the problem numbers. For example: the number 6:4, appearing next to a specific problem, implies that the first number refers to problem 6 in 'College Physics', and the second number to problem 4 in 'University Physics'. If a zero appears in place of either a first or second number, this indicates that there is no corresponding problem for the respective textbook."

The body of the manual discloses the plan of defendants whereby they thought to evade the charge of infringement which might too easily have been sustained had defendants engaged in an obstrusive copying of the text book content.

Confronted with the dilemma demanding on the one hand the presentation, in the manual, of solutions to problems

6. The Court finds irrelevant to the issue of infringement defendants' contention that it is better pedagogy for the instructors to supply the undergraduate with predigested solutions of the problems. We are here concerned not with what the professors ought to establish as educational norms, but with what is acceptable to the physics faculties, and hence a salable commodity.

which were set out in plaintiffs' books but precluding on the other in view of copyright sanctions a convenient collocation of the problem copied from the text and its solution, defendants contrived the device of substituting paraphrase for direct quotation from the problem to be solved. Occasionally, as is hereinafter noted, momentary forgetfulness of their plan of camouflage or difficulty in accommodating it to their objective led them to incorporate in their manual a literal or indefensibly close approximation of what might be found in plaintiffs' texts.

The manual is divided into chapters, the numbering, 24 to 47, corresponding to the numeration of the chapters in Part 2 of plaintiffs' books.[7] The solutions are keyed by numbers to the problems in an arrangement which conforms with the explanation given in the preface (see supra, p. 222).

The solutions consist for the most part of mathematical calculations comprised either of a single statement or of a series of steps with in some instances a nexus of elucidating commentary. A substantial number of the solutions are illustrated by diagrams appropriate to the problem under review. All dimensions, literal, numerical or symbolic quantities, all scalars, vectors, equations, and diagrams, all that is formulistic or graphic in the solutions, finds its origin and counterpart in the words and mathematical jargon or configuration of the Sears and Zemansky problems when read together with the text for which these problems serve as illustrative drill and exercise.[8]

The Court thus far has used the word "solutions" in referring to the end product of defendants' efforts which finds its embodiment in the text of the manual. Defendants, although characterizing their work variously as a "manual of solutions" and as "solutions to the problems appearing in 'University Physics' and 'College Physics' by Sears and Zemansky, Part 2" entitled their brochure on its cover page as "*Solved* Physics Problems" [italics supplied] and thereby more nearly, although with a measure of ambiguity approximate the truth. The problems are indeed solved problems—solved, some long since, some recently—by the genius of intellects other than those of the defendants or of the individual plaintiffs. The solutions of these earlier "solved" problems is implicitly or explicitly present in the prefatory text of plaintiffs' volumes. To render these solutions from that text one need be possessed of no more than a journeyman's skill in the science of physics coupled with a sufficiency of mathematical prerequisites. One so disciplined, with recourse to no other texts and unaided by an oral didactic elucidation, could and should find, immediately or mediately, through an integration of problem and text, what defendants put forward as "Solutions", solutions which by copyright secured they necessarily proffer as possessed of requisite originality.

The solutions, for their part, have no independent viability. Without appropriation of the exact dimensions and magnitudes stipulated, in their context of the postulates propounded in plaintiffs' problems, whatever the form or version

7. Chapters 45, 48 and 49 are not represented in the manual inasmuch as no problems are propounded with respect to these chapters.

8. Actual lifting by the defendants of the Sears and Zemansky diagrams, with minor omissions or additions disregarded by the Court as insubstantial, are to be found in the following Manual solutions: College Physics, Ch. 27, problems 3 and 8; Ch. 29, problems 9, 23, 30(a) and 34; and Ch. 32, problem 11; University Physics, Ch. 27, problems 3 and 8; Ch. 29, problems 3 and 16; and Ch. 29, problem 24(b).

Typical of close paraphrase in a single chapter by language in the solutions carried over from that used in stating the problems are the following references cited to the Court by plaintiff Zemansky upon the trial:

College Physics, Ch. 24, problems 1, 2, 5, 6, 11, 13 and 14. University Physics, Ch. 24, problems 1, 2, 3, 4, 7, 9 and 10.

into which defendants in their effort at disguise may have translated what they purloined, the solutions would exist in vacuo and be meaningless. What gives the solutions their value is that which, and only that which is already in the pirated works.[9]

### Discussion

Neither of the defendants testified at the trial. Whatever contested issues of fact existed which might have been illuminated by their testimony have, accordingly, been passed upon by the Court in light of this unexplained deficiency in defendants' proof.[10] Yet even without the makeweight of an inference to be drawn from such failure of a party to come forward with available proof, the Court could not here upon any reasonable ground reject the uncontradicted testimony of witnesses for the plaintiff which in every regard was wholly credible and unexceptionable. Additionally, Addison as issuee of the certificates of registration established through their introduction into evidence the validity prima facie of its copyright and cast upon defendant the burden of proving invalidity or tendering disproof of the facts stated in the certificate.[11]

Defendants, as an alleged defense in their answer, plead that the problems contained in plaintiff's books "were first published as examination questions given to students by the authors in connection with their teaching duties. This publication without notice invalidates any alleged claim to copyright in said problems by the plaintiffs." Defendants, with the additional burden just noted of a prima facie validity to overcome, fell far short in their proof of establishing what they had alleged as defense. They cited in support the fact that a certain number of problems introduced in both the College and University texts also appeared in a third work, "Modern University Physics," authored by the plaintiff professors in collaboration with two others, and could be found as well in a fourth, "Principles of Electricity and Magnetism," by Emerson M. and Emerson W. Pugh. It develops that these other textbooks were later in copyright, which was likewise secured by plaintiff Addison, than those here in issue. Had the facts been otherwise this would, nevertheless, upon the present showing not have affected the result; for it is not novelty, but originality which entitles plaintiff Addison to copyright protection—an originality, here present in substantial and sufficient degree, in the conception, organization and presentation of material whether new or old. As to what is old, only the common source, not the copyrighted work, except as to fair use, may be resorted to by all, for only the old lies in the public domain.[12]

9. See p. 225 et seq., infra, for discussion of the "idea" which is held not copyrightable, and the "expression of the idea" which may be.

10. N. Sims Organ & Co. v. Securities and Exchange Commission, 293 F.2d 78 (2d Cir. 1961), cert. denied, 368 U.S. 968, 82 S.Ct. 440, 7 L.Ed.2d 396; United States v. Fields, 102 F.2d 535 (8th Cir. 1939); Wigmore, Evidence § 289 (3d Ed. 1940); McCormick, Evidence § 249 (1954).

11. 17 U.S.C. § 209: "Said certificate shall be admitted in any court as prima facie evidence of the facts stated therein." Rohauer v. Friedman, 306 F.2d 933, 935 (9th Cir. 1962); Wihtol v. Wells, 231 F. 2d 550, 553 (7th Cir. 1956); Nutt v. National Institute Inc. for the Imp. of Memory, 31 F.2d 236, 237 (2d Cir. 1929); Freudenthal v. Hebrew Pub. Co., 44 F. Supp. 754, 755 (S.D.N.Y.1942).

12. 17 U.S.C. § 7: "Compilations or abridgments, adaptations, arrangements, dramatizations, translations, or other versions of works in the public domain or of copyrighted works when produced with the consent of the proprietor of the copyright in such works, or works republished with new matter, shall be regarded as new works subject to copyright under the provisions of this title; but the publication of any such new works shall not affect the force or validity of any subsisting copyright upon the matter employed or any part thereof, or be construed to imply an exclusive right to such use of the original works, or to secure or extend copyright in such original works."

"The copyright protects originality rather than novelty or invention * * *." Mazer v. Stein, 347 U.S. 201, 218, 74 S.Ct. 460, 470, 98 L.Ed. 630 (1954). See also Emerson v. Davies, 8 Fed.Cas

Equally unavailing is defendants' contention that what has been gleaned from plaintiffs' store is no more than the idea of the authors, by common consent held not protectable by copyright obtained. The principle thus urged upon the Court fails of exact definition to the degree that its component, the term "idea", is itself not susceptible of precise mensuration. Helpful, however, in effecting a partial delimitation of the reach of the pronouncement as to what is thus not copyrightable is a recognition of the existence of the conjugate principle that the *expression* of an idea per contra may indubitably be copyrighted.[13]

The manifest difficulty confronting plaintiffs in an effort to establish that what has been filched by defendants is the expression rather than the hypostatic concept [14] no doubt motivated the plaintiffs to cast about for the surer support of a specific statutory provision. Defendants' infringement lies, plaintiffs ac-

615, Case No. 4436 (C.C.D.Mass.1845), wherein Circuit Justice Story wrote, p. 618, "The [arithmetic] book of the plaintiff is, in my judgment, new and original, in the sense in which those words are to be understood in cases of copyright. The question is not, whether the materials which are used are entirely new, and have never been used before; or even that they have never been used before for the same purpose. The true question is, whether the same plan, arrangement and combination of materials have been used before for the same purpose or for any other purpose. If they have not, then the plaintiff is entitled to a copy-right, although he may have gathered hints for his plan and arrangement, or parts of his plan and arrangement, from existing and known sources. He may have borrowed much of his materials from others, but if they are combined in a different manner from what was in use before, and a fortiori, if his plan and arrangement are real improvements upon the existing modes, he is entitled to a copy-right in the book embodying such improvement. See Lewis v. Fullarton, 2 Beav. 6. It is true, that he does not thereby acquire the right to appropriate to himself the materials which were common to all persons before, so as to exclude those persons from a future use of such materials: but then they have no right to use such materials with his improvements superadded, whether they consist in plan, arrangement or illustrations, or combinations; for these are strictly his own." Cf. Triangle Publications v. New England Newspaper Pub. Co., 46 F.Supp. 198 (D.C.D.Mass.1942).

13. "Although ideas, abstract conceptions and similar matters are not protectible, on the other hand it is clear that the author's manner of treatment, expression, the incidents and details, and the sequence of events by which he works out and develops the abstractions, are copyrightable elements of his work, and will be protected. Sheldon v. Metro-Goldwyn Pictures Corp., 2 Cir., 1936, 81 F.2d 49, at page 54; '* * * others may "copy" the "theme," or "ideas," or the like, of a work, though not its "expression."' Dam v. Kirk La Shelle Co., 2 Cir., 1910, 175 F. 902, 907; MacDonald v. Du Maurier, 2 Cir., 1944, 144 F.2d 696, 701; De Acosta v. Brown, 2 Cir., 1944, 146 F.2d 408, 409–410; certiorari denied, Hearst Magazines v. De Acosta, 325 U.S. 862, 65 S.Ct. 1197, 89 L.Ed. 1983; Barsha v. Metro-Goldwyn-Mayer, 32 Cal.App.2d 556, 561–562, 90 P.2d 371, 374, 'Although there can be no property in an author's ideas, "there may be literary property in a particular combination of ideas or in the form in which ideas are embodied." Fendler v. Morosco, 253 N.Y. 281, 171 N.E. 56, 58.'" Loew's Inc. v. Columbia Broadcasting System opinion of District Judge reported 131 F.Supp. 165 at p. 172 (S.D.Cal.Central Division 1955), affirmed sub nom. Benny v. Loew's Incorporated, etc., 239 F.2d 532 (9th Cir. 1956) "upon the findings of fact and conclusions of law of the district court and for the reasons set forth in the opinion of (District) Judge James M. Carter," and affirmed, sub nom. Columbia Broadcasting System, Inc., etc. v. Loew's Inc., per curiam and without opinion "by an equally divided court" 356 U.S. 43, 78 S.Ct. 667, 2 L.Ed.2d 583, rehearing denied 356 U.S. 934, 78 S.Ct. 770, 2 L.Ed.2d 764 (1958).
To like effect: Mazer v. Stein, supra, 347 U.S. at p. 217, 74 S.Ct. at p. 470, 98 L.Ed. 630; Baker v. Selden, 101 U.S. 99, 25 L.Ed. 841; Ansehl v. Puritan Pharmaceutical Co., 61 F.2d 131 (8th Cir. 1932), cert. denied, 287 U.S. 666, 53 S.Ct. 224, 77 L.Ed. 374; Guthrie v. Curlett, 36 F.2d 694 (2d Cir. 1929).

14. Cf. the Kantian metaphysical concept of the "noumenon" and its complementary "phenomenon."

cordingly urge, in that they have taken problems which in the original were in part formulated in words. These are stated in relation to numerics with appropriate units [15] to be assumed as the basis for the calculations entering into their solutions. Defendants have transmuted only the lexical statement of the problems into another version, purporting to translate that portion into another language—the language of the mathematician and the physicist.[16] Symbols, sign conventions, equations, graphical representation—all have been substituted by defendants for the verbalisms of the original. The numerics and their units, however, have been—and necessarily so—transported bodily and without change from the texts into the manual. To find a paraphrase for these numerics with their units, which were themselves the symbolic paraphrase of the physicist, apparently posed for the defendants a problem of such difficulty that for it even their ingenuity could find no solution, save perhaps an unacceptable englishing of sign and symbol.

If plaintiffs' view that defendants have translated the copyrighted matter into another "language" or made another "version" thereof were to be adopted by the Court, it would follow that the appropriation exceeds by far what is permissible as fair use of material thus protected.[17] Defendants would in such event, by the express interdict of the statute,[18] be infringers. Neither party

has, however, been able to furnish authorities which directly, or even by close inference, support or require rejection of the construction plaintiffs would assign to the statutory provision. Were this issue presented for determination as *res integra* the Court would be constrained to hold in the context of our dawning space age that each science as it moves into new areas of research and discovery must needs invent its own Esperanto. Plaintiffs' argument based on the claimed existence of a language or jargon into which the sense of the problems has been converted would, in such event, persuade.[19] This decision is, however, more broadly bottomed upon a finding that an unfair use has been made by defendants of the product of plaintiffs' original and useful effort. It may be urged against such ratio decidendi that it involves a paradox, for logically it is only *after* a copyright has been established as valid that the question of its fair use becomes ponderable and significant. Answer to such contention may, however, be found in the circumstance that in considering what has been copyrighted one finds oneself concomitantly considering the use others make of the material certified as eligible for copyright.

■ A conspectus of principles, referent in this discussion, with textual comment and annotation is set out in the appended footnote.[20] Textbooks and scientific works are noted as presenting

15. "numerics with appropriate units":— This terminology is found in the preface p. IX of "College Physics," complete.

16. Modern University Physics, p. 2. "The elegant language of modern physics is higher mathematics, since the modern concepts are impossible to visualize."

17. See infra p. 226 where "fair use" of copyrighted matter is discussed.

18. 17 U.S.C. § 1. *Exclusive rights as to copyrighted works.*
"Any person entitled thereto, upon complying with the provisions of this title, shall have the exclusive right:
* * *
"(b) To translate the copyrighted work into other languages or dialects, or make

any other version thereof, if it be a literary work; * * *"

19. Cf. Triangle Publications, Inc. v. New England Newspaper Pub. Co., 46 F.Supp. 198 (D.C.Mass.1942); Corcoran v. Montgomery Ward, 121 F.2d 572 (9th Cir. 1941), cert. denied, 314 U.S. 687, 62 S. Ct. 300, 86 L.Ed. 550; MacMillan Co. v. King, 223 F. 862 (D.Mass.1914).

20. See Ansehl v. Puritan Pharmaceutical Co., supra, 61 F.2d at p. 137 wherein the court writes:
"In Nutt v. National Institute Inc. for the Imp. of Memory, 31 F.(2d) 236, 237 (C.C.A.2d), the court said: 'The test is whether the one charged with the infringement has made an independent

special problems and requiring special treatment. Those who for their own requirements avail themselves of the instruction given in texts or who apply the are described therein do no more than act upon the license the author grants and do not thereby infringe. But "[t]he use by another of the same methods of statement, whether in words or illustrations, in a book published [by such other person] for teaching the art, would undoubtedly be an infringement of the copyright." [21] "Copying is not confined to a literary repetition, but includes various modes in which the matter of any publication may be adopted, imitated, or transferred with more or less colorable alteration. The disguise of the source from which the material was derived does not defeat the protection of the copyright, nor does taking a part of the work constitute an evasion of the copyright * * *. We do not think it avoids infringement of the copyright to take the substance or idea, and produce it through a different medium, and picturing in shape and details in sufficient imitation to make it a true copy of the character thought of by the appellant's employee." [22] "Copying is not confined to

a literary repetition, but includes various modes in which the matter of any publication may be adopted, imitated, or transferred with more or less colorable alteration." [23]

Rejecting a claim of fair use advanced by a defendant charged in a suit with infringing plaintiffs' copyrighted English language textbook with respect to which defendant had published a key, the Court in its opinion asked with a measure of impatience, "What difference, then, does it make that the defendant's work takes the form of a key to the plaintiffs' textbooks? By what right may he thus appropriate the fruits of the plaintiffs' talents, labors, and industry? Granted that the defendant has produced a serviceable key to aid the instructor. This no more entitles him to take to himself, and publish the literary matter covered by the plaintiffs' copy-right, than does the fact that a second inventor has made an improvement on a patented machine give him the right to use such machine during the life of the first patent." [24]

"Paraphrasing or copying with evasion is an infringement, even though there may be little or no conceivable

production, or made a substantial and unfair use of the complainant's work.'

"In Perris v. Hexamer, 99 U.S. 674, 676, 25 L.Ed. 308, the Supreme Court held that, to infringe a copyright, a substantial copy of the whole or of a material part of the copyrighted composition must be produced. See, also, Dymow v. Bolton, 11 F.(2d) 690 (C.C.A.2d); Wilson v. Haber Bros., 275 F. 346 (C.C.A. 2d); Eggers v. Sun Sales Corp., 263 F. 373 (C.C.A.2d); Roe-Lawton v. Hal E. Roach Studios, 18 F.(2d) 126 (D.C., S.D.Cal.); Simonton v. Gordon, 12 F. (2d) 116 (D.C., S.D.N.Y.); Fisher, Inc., v. Dillingham, 298 F. 145 (D.C., S.D. N.Y.); Falk v. Donaldson, 57 F. 32, 35 (C.C., S.D.N.Y.), in which it was said: 'It is not a question of quantity, but of quality and value; not whether the part appropriated is a literal copy of the original production, but whether it is a substantial and material part.' Weil, American Copyright Law (1917), p. 387.

"A copy of a 'substantial part' constitutes an infringement. It is not necessary that the whole composition be rifled.

Perris v. Hexamer, supra; G. & C. Merriam Co. v. United Dictionary Co., 146 F. 354 (C.C.A.7th), affirmed 208 U.S. 260, 28 S.Ct. 290, 52 L.Ed. 478; Springer Lithog. Co. v. Faulk, 59 F. 707 (C.C.A. 2d); Meccano v. Wagner, 234 F. 912 (D.C., S.D.Ohio)."
See also: Eisenschiml v. Fawcett Publications, 246 F.2d 598 (7th Cir. 1957), cert. denied, 355 U.S. 907, 78 S.Ct. 334, 2 L.Ed.2d 262; Holdredge v. Knight Publishing Corporation, 214 F.Supp. 921 (S.D.Cal.Central Division, 1963); Carr v. National Capital Press, 63 App.D.C. 210, 71 F.2d 220 (1934).

21. Baker v. Selden, 101 U.S. 99, 104, 25 L.Ed. 841 (1879).

22. King Features Syndicate v. Fleischer, 299 F. 533, 535 (2d Cir. 1924).

23. Nutt v. National Institute, etc., 31 F.2d 236 at p. 238 (2d Cir. 1929). (Lectures for improvement of memory.)

24. Reed v. Holliday, 19 F. 325 (Cir.Ct. W.D.Penn.1884).

identity between the two. 13 Corpus Juris, 1109." [25]

A British Court in a case dealing with a situation somewhat akin to that here sub jud. held that a copyright secured by a University on its examination papers was infringed by the unlicensed publication of the answers to the questions comprising such papers, the Court writing, "It could not be contended that the mere republication of a copyright work was a 'fair dealing' because it was intended for purposes of private study; nor if an author produced a book of questions for the use of students could another person with impunity republish the book with answers to the questions. Neither case would, in my judgment, come within the description of 'fair dealing.' " [26]

Judge Learned Hand observed in an opinion which he wrote for the majority of the Court of Appeals in this circuit [27] that "[t]he test for infringement of a copyright is of necessity vague. In the case of verbal 'works' it is well settled that although the 'proprietor's' monopoly extends beyond an exact reproduction of the words, there can be no copyright in the 'ideas' disclosed but only in their 'expression.' Obviously, no principle can be stated as to when an imitator has gone beyond copying the 'idea,' and has borrowed its 'expression.' Decisions must therefore inevitably be *ad hoc.*"

Of preponderant importance to the Court in evaluating the merits in doubtful cases so that it may arrive at its decision with a minimum of "ad hoc" and a maximum of legal justification is the recognition by it of "[t]he economic philosophy behind the [constitutional] clause empowering Congress to grant patents and copyrights." That philosophy persuades "that encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of authors and inventors in 'Science and useful Arts.' Sacrificial days devoted to such creative activities deserve rewards commensurate with the services rendered." [28]

■ It is clear that defendants' parasitical excrescence upon plaintiffs' distinguished and useful works profits defendants alone.[29] In this symbiosis defendants thrive, while their manual kills the host it feeds upon. The Court sees nothing here warranting the exercise by it of an exigent astuteness to ferret out some legal justification for defendants' overuse of plaintiffs' copyrighted material. If the issue is at all doubtful— and in the Court's view it does not appear to be—such doubt should, in good conscience and in fulfillment of the constitutional [30] mandate, be resolved in plaintiffs' favor.

Conclusions of law as thus far found, are that the plaintiffs are entitled to the injunctive relief set out in the opening paragraph of this opinion.

25. Nutt v. National Institute, etc., supra, 31 F.2d at page 237. See also West Publishing Co. v. Edward Thompson Co., 169 F. 833, 862 (Cir.Ct.E.D.N.Y.1909) mod. on other grounds 176 F. 833, 838 2nd Cir. 1910); West Pub. Co. v. Lawyers' Cooperative Pub. Co., 79 F. 756, 762 (2d Cir. 1897); Ansehl v. Puritan Pharmaceutical Co., supra, 61 F.2d at p. 138.

26. University of London Press Limited v. University Tutorial Press, Limited, 2 Ch. 601 (1916 U. 119).

27. In Peter Pan Fabrics, Inc. v. Martin Weiner Corp., 274 F.2d 487 (2d Cir. 1960).

28. Mazer v. Stein, supra, 347 U.S. at p. 219, 74 S.Ct. at p. 471, 98 L.Ed. 630.

29. Cf. College Entrance Book Co. v. Amsco Book Co. Inc., 119 F.2d 874, 876 (2d Cir. 1941); Carr v. National Capital Press, 71 F.2d 220 (D.C.Cir. 1934); Henry Holt & Co. Inc., etc. v. Liggett & Myers Tobacco Co., 23 F.Supp. 302, 304 (D.C.E.D.Penna.1938).

30. Constitution of the United States, Article 1, Section 8, Clause 8: "To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."